1         IN THE UNITED STATES DISTRICT COURT
       FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

3 UNITED STATES OF AMERICA    :
                       :   Case Number
        vs.           :   1:12-CR-00107
4                        :   (Judge Rambo)
  TERLAZZO WILTSHIRE,      :
5            Defendant    :

6

7

8             TRANSCRIPT OF PROCEEDINGS
              IN RE:   SENTENCING

9       Before:   HONORABLE SYLVIA H. RAMBO

10       Date  :  August 7, 2013; 10:35 a.m.

11       Place :  Courtroom Number 3, 8th Floor
               Federal Building
12                228 Walnut Street
               Harrisburg, Pennsylvania
13

14

15 COUNSEL PRESENT:

16     UNITED STATES ATTORNEY'S OFFICE
    BY:  WILLIAM A. BEHE, ASSISTANT U.S. ATTORNEY
17
        For - Government
18
    KENT D. WATKINS, ESQ.
19
        For - Defendant
20

21 ALSO PRESENT:

22     REBEKAH LICHTENBERGER, U.S. PROBATION OFFICER

23

24

25               Lori A. Shuey, RMR, CRR
              Federal Official Court Reporter

THE COURT:  Mr. Behe.

MR. BEHE:  Yes, Your Honor, this is the time and place set by the court for sentencing in the matter of the *United States of America v. Terlazzo Wiltshire*, which is at this Court's Criminal Docket Number 12-107, Defendant Number 1. Mr. Wiltshire is present in court, along with counsel, Mr. Watkins.

This matter had been before the court last week and I believe continued to this week because of some unanswered questions, but we're ready to proceed at this point.

THE COURT:  Mr. Wiltshire.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Have you read the presentence report that was filed in this case along with any amendments thereto?

THE DEFENDANT:  Not all of it, no.

THE COURT:  You haven't?

THE DEFENDANT:  Just what I received today.

MR. WATKINS:  No, that's mine.  She said the PSI.

THE DEFENDANT:  Oh, yes, I read it when it was given to me last time.

THE COURT:  There have been no objections filed.  Are you satisfied with the report as filed?

THE DEFENDANT:  No, I'm not satisfied, Your Honor.

THE COURT:  What's your objection?

THE DEFENDANT:  My objection is my actual point level.

1  I was -- in 1998, '99, I was sentenced to 13 years in prison.

2  Following my sentence, I had charges of burglary, grand

3  larceny, and at the age of 15, I had a sex abuse that I

4  received probation for.

5      When I was sentenced, the judge ran all my charges

6  concurrent.  And after looking at my points now, it's -- like,

7  I received three points for each additional charge when they

8  were all ran concurrent.

9      THE COURT:  Which charges are they, now?  Show him the

10  report.

11     MR. WATKINS:  Page 6.  It's Page 6 and 7.

12     THE COURT:  I've got six, but six only has one sexual

13  abuse.

14     MR. WATKINS:  On Page 7 then.

15     THE COURT:  But those were a different year.

16     MR. WATKINS:  That's what I had said.  Mr. Wiltshire

17  keeps telling me -- and I have not been able to confirm -- that

18  he was sentenced to concurrent sentences.  And according to the

19  presentence report, he was sentenced on different days.

20     THE COURT:  Days and different dates.

21     MR. WATKINS:  Different arrest dates and different

22  sentencing days.  He said they were all run concurrent.  Maybe

23  the final sentence did run them all concurrent, but that

24  doesn't change the fact of the different sentencings.  That's

25  my interpretation of it.

1          THE COURT:  Do you have any information?

2          PROBATION OFFICER:  Your Honor, what defense

3     counsel -- I believe he's correct in what he's saying.  They

4     may have been run concurrently, but under the guidelines,

5     they're --

6          THE COURT:  They're separate counts.

7          PROBATION OFFICER:  Right, counted separately,

8     correct.

9          THE COURT:  Okay.  Any other objections?

10          THE DEFENDANT:  Yes.  Also -- I'm sorry, Your Honor,

11     it's just -- I'm a little disturbed right now.  Also prior

12     to some new incident that occurred, I would like to take a

13     moment to address the court about it.

14          THE COURT:  I'm not interested in -- you are charged,

15     are you not?

16          THE DEFENDANT:  Yes, I was charged.

17          THE COURT:  Have you read the memorandum dated

18     July 8th, 2013?

19          MR. WATKINS:  That's the one amendment that talks

20     about your new arrest.

21          THE DEFENDANT:  This here?

22          THE COURT:  You've read that?

23          MR. WATKINS:  No, that's what I prepared.  The thing

24     that was sent by the probation office, I sent you a copy --

25          THE DEFENDANT:  Oh, yes.  Yes, I read it.

1　　　　　MR. WATKINS:　-- that talks about your new arrest.

2　　　　　THE DEFENDANT:　I read it.

3　　　　　THE COURT:　Now, I am not interested in hearing

4　whether you're guilty or innocent of those because I am not the

5　judge on that.　But you were charged and arrested by the

6　Pennsylvania State Police in Wyoming, Pennsylvania?

7　　　　　THE DEFENDANT:　Yes.　My thing, Your Honor, is that at

8　the time of this arrest, I was actually doing work for a

9　federal marshal, and I was trying to explain to the arresting

10　officer the work I was doing.

11　　　　　When I went to the precinct, they made it like, you

12　know, well, this is the state, you have to deal with that in

13　the federal.　I explained to him that I've been working with

14　this federal marshal since March 7th and been in constant

15　contact with him and have gathered up so much information.

16　　　　　THE COURT:　You're saying that these are charges that

17　you did as an undercover or --

18　　　　　THE DEFENDANT:　Yes, yes.　They stated that they had

19　surveillance, and I asked if it was possible that you guys can

20　actually observe the surveillance, because not one time have I

21　ever sold anybody any drugs.　When I told this to the state

22　trooper, he told me, well, you have to deal with that with

23　federal, this is state.

24　　　　　THE COURT:　Mr. Behe, do you know of anything, whether

25　he was acting undercover?

1     MR. BEHE:  By way of proffer, I spoke directly to the

2     arresting trooper who was involved, and there were two

3     controlled purchases of crack cocaine on successive dates.

4     One, the sale was made directly by the defendant in the company

5     of a woman who is a co-defendant, I think, in the case or is

6     named in this case.  And the next day the sale occurred with

7     the defendant driving the woman to meet with the confidential

8     informant, and they went into a ladies' room where the drugs

9     were sold.

10          When the police came out to arrest Mr. Wiltshire and

11    the young lady who was with him, she discarded a package of

12    heroin and Ecstasy, and both were arrested.

13          The first sale was a direct sale of approximately an

14    eightball of crack by the defendant to a confidential

15    informant.  Both sales were arranged over the telephone

16    directly with Mr. Wiltshire.

17          THE COURT:  And he was not an undercover person?

18          MR. BEHE:  No.

19          THE COURT:  Okay.

20          MR. BEHE:  And if the marshal were here, he would say

21    that he never, ever authorized anyone to distribute drugs,

22    would never authorize anyone to distribute drugs, did not tell

23    him to freelance or do whatever he might have been doing on

24    this occasion.

25          The defendant was trying to say that he was going to

infiltrate the Crips or the Bloods gangs.  He was told not to do that, not to be involved in that.

Now, he did, in fact, assist in the arrest of two federal fugitives, three local fugitives, was up in the Wilkes-Barre --

THE COURT:  Not related to this episode?

MR. BEHE:  No, no, it had nothing to do -- nobody had any idea what was occurring this evening except the state trooper who had information that the defendant was involved in selling crack and they purchased crack from him on one occasion directly and then the second occasion arranged over the phone, and he drove the same girl who was with him the previous evening to sell the crack to the CI the second occasion, and they arrested him right there on the spot.

THE COURT:  Who is the marshal?

MR. BEHE:  Gary Duncan from Harrisburg.

THE COURT:  Gary.

MR. BEHE:  And he referred Mr. Wiltshire, because he had information about goings-on in the Wilkes-Barre area, up to the marshals in the Scranton area.

There's no doubt he was helping with fugitives, and it would have been great for his sentencing had he not gone out and freelanced and been involved in drug trafficking, but that's the allegations, that's the evidence that the trooper has, and that's why we haven't filed a 5K1 motion.

1      Now, I know he's in a not-guilty posture.  I don't

2    know whether the court can consider a new charge where he's

3    maintaining his innocence as a reason to take away acceptance

4    of responsibility, but it certainly is a reason for the United

5    States Attorney to conclude that based on that conduct, a 5K1

6    motion wouldn't be filed.

7       I've had instances where individuals have been

8    charged, they still have preliminary hearings and they're still

9    maintaining their innocence, and it's been difficult to deny

10   them acceptance when they're saying, I'm not guilty of that

11   offense.

12      THE COURT:  I've done some research on this, and it's

13   split among the circuits, many of them indicating that if it's

14   a different charge not related to anything that he's now

15   currently charged with, that I shouldn't deny the acceptance of

16   responsibility.  However -- and he hasn't been tried yet on the

17   charges.

18      MR. BEHE:  He waived a felony and a misdemeanor into

19   court, and all the other charges were dismissed, kind of

20   horse-trading at the preliminary hearing.

21      THE COURT:  I think in order to keep the record clear,

22   I probably will give him acceptance of responsibility and not

23   deny it based on his apparent plea of not guilty to these

24   charges.

25      MR. BEHE:  So we would be at a 151 to 188.

1          THE COURT:  151.

2          MR. BEHE:  To 188 range.

3          THE COURT:  To --

4          MR. BEHE:  188 I believe is the upper end.

5          THE COURT:  It's -- hold on.

6          MR. WATKINS:  151 to 188 --

7          THE COURT:  188.

8          MR. WATKINS:  -- under a category six --

9          THE COURT:  Six.

10         MR. WATKINS:  -- is the guidelines, Your Honor.

11         THE COURT:  It's 151 to 188.

12         MR. BEHE:  Criminal history category six because of

13    the determination that he is a career offender.

14         THE COURT:  Category six.  So that's what I'll go by.

15         MR. WATKINS:  Your Honor, I had prepared a memorandum.

16         THE COURT:  It's too late now.  I should have had it

17    before today.  I think there's a rule of five days before

18    sentencing.

19         MR. WATKINS:  Okay.

20         THE COURT:  You may speak on his behalf, however.

21         MR. WATKINS:  Your Honor, as Mr. Behe said, he was

22    working with the federal agents.  He had also been in touch

23    with Bill Cook from the DEA, Mr. Behe confirmed this, about

24    some drug activity in the Wilkes-Barre area.

25         Mr. Duncan was here the last time.  My understanding

1  was that Mr. Duncan was aware of what Mr. Wiltshire was doing

2  with Sherri Dixon, who is the woman involved in this case.  The

3  affidavit of probable cause of the -- is somewhat different

4  from what the police represented to the U.S. Attorney's Office

5  and the probation office.

6       I had discussed -- sent a copy to Mr. Behe.  It

7  indicates that Sherri Dixon was the person who made the deal,

8  she had the money, and that --

9       THE COURT:  Well, I'm not going to deny him --

10      MR. WATKINS:  I understand.

11      THE COURT:  -- acceptance, so there's no need to go

12  into the facts of the underlying charges he's facing in state

13  court.

14      MR. WATKINS:  Well, I was just -- the fact that he was

15  working for the government, I had asked for a departure in

16  consideration of that.  I know that the new charge is still

17  pending and the decision is split and it's totally

18  discretionary with the court, but that was my representation.

19      THE COURT:  Now, did he honor the agreement to

20  cooperate at all, Mr. Behe?

21      MR. BEHE:  Oh, yes.  According to Agent Duncan, he was

22  responsible for or at least his girlfriend assisted, as well --

23  in an email message from Mr. Duncan yesterday, he confirmed

24  that Mr. Wiltshire is responsible for two federal -- the arrest

25  of two federal fugitives and the arrest of three local

1    fugitives, as well.

2         And then, as I said, because of the information he had

3    provided about activity in the Wilkes-Barre area, he was up in

4    that area and was to be assisting the United States Marshals

5    Service, but there wouldn't be an agent, a witness, a deputy

6    marshal who would ever condone somebody freelancing and selling

7    that.

8         Like I said, it's regrettable, because he had been

9    doing very good work in their assistance -- or in his

10   assistance to the U.S. Marshals.  I guess the court can

11   consider that as a variance if you wanted to.  But that kind of

12   ties our hands in the U.S. Attorney's Office in terms of --

13        THE COURT:  Understand.

14        MR. BEHE:  -- whether we think that would warrant a

15   5K1 motion.

16        THE COURT:  Okay.  Anything else you wish to --

17        MR. WATKINS:  Not I personally, Mr. Wiltshire.

18        THE COURT:  You may speak on your own behalf.

19        THE DEFENDANT:  One more thing, Your Honor.  I also

20   wanted to speak as far as the chemical balance of my original

21   charge that I took the plea for.

22        THE COURT:  The what?

23        THE DEFENDANT:  The chemical balance of the crack

24   cocaine that I was originally charged for, that I'm here for

25   today.  It was at 24 grams, but I never -- well, my lawyer

asked if he can get the cut base of it.  I remember one time

that you did ask the district attorney for it.  But that was,

like, in the earlier stages of, you know, me first coming to

court.

THE COURT:  I'm not too sure what he's asking.

THE DEFENDANT:  I was actually arrested for 24 grams

of crack cocaine.

THE COURT:  Correct.

THE DEFENDANT:  And I was asking my lawyer to present

the chemical base, the cut that was actually in the crack

cocaine, because they have it at its full weight, which is

24 grams.  They're saying that it was 24 grams of crack

cocaine, which was actually not --

THE COURT:  That's the way the guidelines run.

MR. BEHE:  Not only the guidelines, but the statutes

talk about a mixture or substance --

THE COURT:  Mixture.

THE DEFENDANT:  Right, the mixture or substance.

MR. BEHE:  -- containing a detectable amount.  So that

all of the substance is counted regardless of what the actual

amount of drug is.

MR. WATKINS:  I explained this to Mr. Wiltshire.  He's

talking about purity, I think is what he meant by the cut.

THE COURT:  But the statute and the guidelines say a

detectable amount, and the whole amount gets weighed.

1          MR. WATKINS:  I explained that to Mr. Wiltshire.

2          THE DEFENDANT:  I just -- I wasn't familiar with it,

3   so I just wanted to speak on it.  Thank you.

4          THE COURT:  Anything else?

5          THE DEFENDANT:  That's it, Your Honor.  Thank you.

6          THE COURT:  Mr. Behe.

7          MR. BEHE:  Nothing, Your Honor, beyond the fact that

8   Mr. Wiltshire did live up to his agreement and assist the

9   marshals in apprehending the two fugitives that they had been

10  looking for for a good while and the three local fugitives.

11         Mr. Wiltshire, though, was a substantial drug

12  trafficker, and if Your Honor will recall, his involvement with

13  the local authorities and the DEA was in a two-step process.

14  They caught him originally, he agreed to cooperate, and then he

15  disappeared.  They caught him again when he was back in the

16  area dealing drugs again.

17         So while he was out on bail from the other activities,

18  he became involved again, and which led to his charge.  But

19  then he did cooperate.  I defer to the court on the request for

20  a variance.  That's all I would have.

21         THE COURT:  Enter this order:  Now, this 7th day of

22  August, the year 2013, the defendant appearing in court for

23  purposes of sentencing, pursuant to the Sentencing Reform Act

24  of 1984 and after having considered the factors set forth in 18

25  U.S.C. Section 3553(a), it is the judgment of the court that

the defendant, Terlazzo Wiltshire, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 151 months.

The court finds that the defendant has the ability to pay a fine. It is ordered that the defendant shall pay to the Clerk, U.S. District Court, the sum of $1100 consisting of a special assessment of $100 due immediately and a fine of $1,000.

During the term of imprisonment, the fine is payable every three months in an amount after a telephone allowance equal to 50 percent of the funds deposited into the defendant's inmate trust fund account.

In the event the fine is not paid in full prior to the commencement of supervised release, the defendant shall, as a condition of supervised release, satisfy the amount due in monthly installments of no less than $50 to commence 30 days after release from confinement.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of three years. The defendant shall report in person to the probation office in the district to which the defendant is released within 72 hours of release from custody.

While on supervised release, the defendant shall not commit another federal, state, or local crime and shall not possess a dangerous weapon.

1    The defendant shall comply with the standard

2 conditions that have been adopted by this court and shall

3 comply with the following additional conditions:

4    One, defendant shall submit to one drug test within 15

5 days of release from custody and at least two periodic drug

6 tests thereafter.

7    Two, defendant shall cooperate in the collection of a

8 DNA sample as directed by the probation officer unless one was

9 collected during imprisonment.

10    Three, defendant shall undergo a substance abuse

11 evaluation, and, if recommended, the defendant shall

12 satisfactorily complete a program of outpatient or inpatient

13 substance abuse treatment.

14    Four, defendant shall not incur new credit charges or

15 open additional lines of credit without the approval of the

16 probation officer unless the defendant is in compliance with

17 the installment schedule for payment of restitution, fines, or

18 special assessments.

19    Five, defendant shall provide the probation officer

20 with access to any requested financial information.

21    And, six, defendant shall apply all monies received

22 from income tax refunds, lottery winnings, judgments, and/or

23 other anticipated or unexpected financial gains to the

24 outstanding court-ordered financial obligations.

25    The following statement of reasons is placed on the

1    record for the sentence that has been imposed:  The court

2    adopts the original presentence investigation report without

3    change.  Does this carry a mandatory minimum?

4           PROBATION OFFICER:  No, Your Honor.

5           THE COURT:  Okay.  No count of conviction carries a

6    mandatory minimum.  The fine is below the guideline range

7    because of the defendant's inability to pay.  The sentence is

8    within the guideline range, and that range is greater than 24

9    months.

10           The court has imposed the sentence for the following

11    reasons:  One, this defendant was involved in a substantial

12    amount of cocaine, both powder and crack cocaine.  The court

13    recognizes that he initially did cooperate with the government,

14    but his conduct prior to sentencing, while the court did not

15    take away his acceptance of responsibility three-point

16    reduction, I do consider that in sentencing him to the minimum

17    of the guideline range and will not grant the requested

18    variance for the aforesaid reasons.

19           Now, you can appeal your conviction if you believe

20    that your guilty plea was somehow unlawful or involuntary or

21    there was some other fundamental defect in these proceedings

22    that was not waived by your guilty plea.  You also have a

23    statutory right to appeal your sentence under certain

24    circumstances, particularly if you think the sentence is

25    contrary to law.

1    You have 14 days from this day in which to file a

2  Notice of Appeal.  If you're unable to pay the costs of an

3  appeal, you may apply for leave to appeal in forma pauperis.

4  You may also request the Clerk of Court to prepare and file a

5  Notice of Appeal on your behalf.  I believe there are counts to

6  be -- I'm sorry.

7    PROBATION OFFICER:  Your Honor, may I approach?

8    THE COURT:  Yes.

9   (Discussion held off the record at sidebar.)

10    THE COURT:  I need to make a correction.  There was a

11  new statement of reasons supplied which took into account the

12  deletion of acceptance of responsibility.

13    So for the statement of reasons, the court adopts the

14  presentence investigation report with the following reasons:

15  There's a change in Chapter 3 because the court reinstituted a

16  three-point reduction for acceptance of responsibility, which

17  would give you the 151 to 188, I think it is.

18    MR. BEHE:  Yes, it's 151 to 188, Your Honor.

19    THE COURT:  I just needed to change the statement of

20  reasons.

21    MR. BEHE:  Mr. Wiltshire has some lingering concerns

22  about the composition of the presentence investigation report

23  thinking that he really should be sentenced under an offense

24  level 26 as opposed to 29.

25    I'm trying to point out to him that because he's a

1  career offender with an offense that is 20 years or more, he
2  started at level 32.  When he receives a three-level off for
3  acceptance, that's what took him to level 29.  He doesn't go to
4  level 26.  So a 29, category six, is a 151 to 188 range.  If
5  the presentence report --
6      MR. WATKINS:  No, the presentence report reflects on
7  Page 6 that the offense level is 29 and includes an increase of
8  three levels for acceptance of responsibility.
9      MR. BEHE:  All right.  I hope that answers your
10  question.
11      THE COURT:  Does he have a copy of the presentence
12  report?
13      MR. WATKINS:  Yes, he has a copy of the presentence
14  report and the addendum.  And we met -- actually, we met in
15  Wilkes-Barre to go over it when his original sentencing date
16  was scheduled.  But then the government asked him to stay out
17  longer, I think it was in May, to stay out longer to do more
18  work for them.  And that's when we covered that.  The addendum,
19  of course, came more recently.
20      THE COURT:  Right.
21      MR. WATKINS:  But he was sent a copy of that, also.
22      THE COURT:  The addendum was based on removing the
23  acceptance of responsibility.
24      MR. WATKINS:  Yes.
25      THE COURT:  And, of course, I'm not accepting that.

1     MR. BEHE:  I would also ask to dismiss Counts 2, 3,

2  and 4.  He pled guilty to Count 1 of the indictment, Your

3  Honor.

4     THE COURT:  Counts 2, 3, and 4 are dismissed.  You had

5  something you wanted to say?

6     THE DEFENDANT:  Yes, Your Honor.  I just wanted to say

7  to you and the courts that I appreciate what was done for me of

8  me being released.  There's a lot that's not being said today,

9  and I think it's unfair, because for every day I was out there,

10  I did work and I risked my life.

11     And I must admit, Gary Duncan, he did reach out to the

12  officers in Wilkes-Barre, and nobody done anything.  I could

13  have came and got sentenced.  If you notice, I had a date and

14  it was adjourned, July 30th.  It was because of the work I was

15  doing and because I was on hold and people was telling me that

16  they're gonna contact me and do all this.

17     And every day I was out there, and I sent them texts

18  and everything concerning -- I just don't -- you know, it just

19  hurts, because I could have died out there.  And I told them --

20  every day I told them what I did.  I told them when I went to

21  see my kids, I told them that I was gonna try to get a job.  I

22  was doing everything right.

23     I don't know what person or the state got with this

24  federal stuff, but that's what he made it to be, like, you

25  know, well, this is the state, you have to deal with it in the

1    federal.  And it's shining a bad light on me because I didn't

2    sell anybody any drugs.

3         THE COURT:  Well, I cannot force the government to

4    file a 5K1.1.  However, I do have the ability to take into

5    consideration what cooperation you did.  However, I've done

6    that by granting you the low end of the guideline, and I don't

7    think, in light of the facts concerning your other conduct out

8    there -- while I did not take away your acceptance of

9    responsibility, you have apparently engaged in some conduct

10   that I don't think I should give you credit as a variance.

11        THE DEFENDANT:  But I was being told if I was to catch

12   this fugitive, there's a possibility I can get probation.

13   Like, that's what I said, there was a whole bunch of things

14   said.  I don't know what's going on today.

15        THE COURT:  When I took your plea, I asked you whether

16   or not anybody made any promises of any kind to you, including

17   whether anybody promised you what your sentence would be, and

18   you said no.

19        THE DEFENDANT:  No, this is recent.  This is when I

20   was released.  You released me on March 7th.  And this is why

21   I'm here.  Like, it just hurts because it's like I feel like

22   I'm not being heard.  And I'm not lying about this.  I did

23   everything I can do, and I stayed in contact with Gary Duncan

24   three to four days out of the week, as many days -- I could

25   have been home with my family.  I was just told to go out there

1    and get another fugitive, one that I got while I was in prison,

2    and the other one I was supposed to get, I've done that.

3          And I was told that, you know, if I was to do that,

4    since both clients was on Behe's, you know, caseload, that it

5    would benefit me, that, you know, it would look good for me,

6    possibly I can get probation.  I actually stayed out there --

7          THE COURT:  You would not get probation on the amount

8    of drugs that you distributed.

9          THE DEFENDANT:  But I'm just speaking what's going on,

10   Your Honor.  I mean --

11         MR. BEHE:  Can you identify on the record who told you

12   you could get probation?  Because I've never spoken to you.  I

13   would never promise -- I never promise anybody --

14         THE DEFENDANT:  I didn't say you, sir.

15         MR. BEHE:  Okay.  Well, can you identify --

16         THE DEFENDANT:  Who you was in contact with is who

17   told me this, and that's why I actually went to the

18   Wilkes-Barre --

19         THE COURT:  Who told you that?

20         THE DEFENDANT:  Gary Duncan told me.

21         MR. BEHE:  Gary Duncan told you if you assisted in --

22         THE DEFENDANT:  He said --

23         MR. BEHE:  Let me finish.  I want to make sure I

24   understand.  Gary Duncan told you if you assisted in getting

25   fugitives, you could go from a guideline imprisonment range of

1  around 20 years down to probation?  You could get a
2  probationary sentence?

3          THE DEFENDANT:  He told me Nice.  He told me Nice.  I
4  got him Maurice Henderson, and there was another guy that, from
5  my understanding, is under your file, which is -- I don't know
6  his government name, but he go by the name of Nice.

7          And I went out there and did what I had to do, and I
8  found out that he was in the Poconos area and that he sold
9  Oxycontin to a guy that passed away by taking the medicine.

10          Gary texted me and told me that -- he said, we got
11  Nice, and he said, I'm gonna give you all the credit and
12  everything for it.  I said, all right.

13          THE COURT:  Maybe I need Mr. Duncan here.

14          MR. BEHE:  I still didn't get an answer to my
15  question.

16          THE DEFENDANT:  I just told you.

17          MR. BEHE:  No, you're telling me what you did.  I'm
18  asking you what Gary Duncan said.  Did Gary Duncan tell you
19  that if you assisted, you could get probation?

20          THE DEFENDANT:  He said Nice.  He said, you out there,
21  I'm not worrying about anything else, no drugs.  He said that
22  if you get Nice, that's the big fish that will help you get
23  probation.

24          THE COURT:  You hope you get probation?

25          THE DEFENDANT:  No, he said it will get you probation.

He said that --

     MR. BEHE:  Is that in a text message, or is it in a voice conversation?

     THE DEFENDANT:  Both, through text and through voice. He told me that the guy -- that both guys was under Behe's, you know, caseload.  It was one Maurice Dickinson, he told me that this is the guy that Behe wants, that's what he's focused on.

     The reason why he directed me to the drug DEA in Scranton is because he said he don't deal with drugs, he deal with fugitives.  And I said, all right.  And that's why I started working on catching more fugitives.

     That was just the whole situation.  That's why I'm here today.  And it's like -- I just feel like I'm being closed in, and nobody is not speaking on my behalf, because there was more done than what you're hearing today.

     MR. BEHE:  Well, whether he did more or not is -- I don't know what more I could say about what he did to cooperate.  I told the court he cooperated.

     The thing that prevented him from getting the 5K1 motion is the information from the trooper that they had a direct buy from the defendant of crack cocaine.

     I can't construct any scenario where any agent, deputy marshal, local officer, would tell somebody, you're authorized to sell drugs to somebody else without the knowledge of the people that you're working with.

1   And in this case, as Mr. Watkins can confirm, even

2 though his comments might not have been as clear on that, the

3 affidavit of probable cause does state specifically that

4 Mr. Wiltshire engaged in a hand-to-hand sale of crack cocaine

5 to a confidential informant.

6   THE DEFENDANT:  And it also say that I was under

7 surveillance.

8   THE COURT:  Let him finish.  Don't interrupt.

9   THE DEFENDANT:  I'm sorry.

10   MR. BEHE:  I spoke directly to the trooper to find out

11 what it was, was this dismissed at the hearing, because there

12 were no -- he said no, things were waived into court.  We

13 dismissed other things because the public defender's office

14 said you have to deal -- you have a more serious matter pending

15 in federal court, we'll just waive in the one felony.  But you

16 were on a track to getting a 5K1 motion until the Pennsylvania

17 State Police arrested you for selling drugs.

18   Now, I don't know what anybody promised you, what

19 anybody represented to you that you would get, but you can at

20 least tell the court, I never promised you what sentence you

21 would get.  And the court asked you under oath if anybody

22 promised you, but you're saying after your guilty plea there

23 were promises made?

24   THE DEFENDANT:  Yes.  Yes, it happened after the fact.

25 And, yes, you know -- I don't want to combat.  It's not about

1    that.  I'm just trying to prove my innocence on something.  I'm

2    explaining to you that -- you're saying that --

3           MR. BEHE:  Well, you know, if you have a lawyer --

4           THE DEFENDANT:  Could I speak, please?

5           MR. BEHE:  But what I'm trying to do is make sure that

6    you don't hurt yourself.

7           THE DEFENDANT:  I'm not.

8           MR. BEHE:  You have a lawyer --

9           THE DEFENDANT:  I'm not, because I'm speaking from the

10   heart.  I'm being honest.  And I'm just saying --

11          MR. BEHE:  If you have a lawyer on pending criminal

12   charges, you may not want to talk about them.

13          THE DEFENDANT:  I'm gonna speak on it because there's

14   no truth to it.  It stated that I was under surveillance.  I've

15   asked, all right, view that surveillance.  You're telling me

16   today that I was selling drugs.  You were not there.  You're

17   taking the word --

18          THE COURT:  It wasn't important at this point.  Those

19   are issues that have to be raised in your state sentence.

20          THE DEFENDANT:  I know, I know.  Your Honor, Sylvia

21   Rambo, I understand that, but it was brought to the probation

22   with a lie.  If you read the report, the state trooper must

23   have told him --

24          THE COURT:  I'm disregarding that.

25          THE DEFENDANT:  Right, right.

1          THE COURT:  I've given you three points for acceptance

2     of responsibility.  I'm not denying it based on that.

3          THE DEFENDANT:  Right, but I don't even want to go off

4     issue.  You asked me a question, and I told you, you know, what

5     I was told.  When you asked me on the record at that time, I

6     was not promised anything.  The only thing --

7          THE COURT:  I know, it's an after-the-fact.

8          THE DEFENDANT:  After the fact, because there was one

9     more fugitive that's on his caseload.  I don't know the guy's

10    government name, but they call him Nice.  And it was like, he

11    really want this guy.  You know, that's what I was told, he

12    really want this guy, and, you know, this can really get you

13    probation.  And I worked hard to do that, and I've done it.

14    I've done it.

15         And I never -- I never thought, like, my guidelines

16    would be this high today, so it's shocking to me, because after

17    I even got that guy, I still was there -- instead of being

18    brought back to court to get sentenced for what I was told, I

19    ended up staying out there and getting more intel for them, and

20    nobody acted on it.  So now it's like all that that I've done

21    has just gone to waste, and this could have been prevented.

22         THE COURT:  Take a recess.

23         COURTROOM DEPUTY:  Court's in recess.

24         THE COURT:  The judgment is not final on this.

25       (Recess taken.)

1    THE COURT:  I am not going to alter the sentence that
2 I gave.  The sentence stands as stated.  Court's in recess.  Is
3 there a place for confinement?
4    MR. WATKINS:  I'm sorry?
5    COURTROOM DEPUTY:  Recommendation for placement.
6    MR. WATKINS:  No, I don't have one.  Mr. Wiltshire.
7    THE DEFENDANT:  Well, my family live in New Jersey,
8 New York and New Jersey.
9    THE COURT:  Okay.  The court will recommend either
10 one, a place of confinement in either New York or New Jersey.
11 New Jersey might be Fort Dix.
12    MR. BEHE:  I'm not sure, and I don't know what part of
13 New York he's referring to.
14    THE DEFENDANT:  Well, originally I'm from Brooklyn,
15 New York.
16    THE COURT:  Well, is there family there in Brooklyn?
17    THE DEFENDANT:  Yeah.
18    THE COURT:  Okay.  Or Brooklyn, New York.  Thank you.
19    MR. BEHE:  Thank you, Your Honor.
20    THE COURT:  Court's in recess.
21    COURTROOM DEPUTY:  Court's adjourned.
22    (Whereupon, the proceedings were concluded at 11:17 a.m.)
23
24
25

1                    CERTIFICATION

2         I hereby certify that the proceedings and

3    evidence are contained fully and accurately in

4    the notes taken by me on the within

5    proceedings and that this copy is a correct

6    transcript of the same.

7         Dated in Harrisburg, Pennsylvania, this

8    4th day of November, 2013.

9

10
                    **/s/ Lori A. Shuey**
11                   Lori A. Shuey, RMR, CRR
                    Federal Official Court Reporter
12                   United States Courthouse
                    228 Walnut Street, P.O. Box 983
13                   Harrisburg, PA  17108-0983
                    (717)215-1270
14

15

16

17

18

19

20

21

22

23

24

25